**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| CHRISTOPHER S. ALFORD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:14-cv-02098-TWP-DML |
| | ) | |
| CAROLYN W. COLVIN, Acting Commissioner | ) | |
| of the Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY ON JUDICIAL REVIEW**

Plaintiff Christopher S. Alford ("Alford") requests judicial review of the final decision of

the Commissioner of the Social Security Administration (the "Commissioner"), denying his

applications for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social

Security Act (the "Act"), and Supplemental Security Income ("SSI") under Title XVI of the Act.[1]

For the reasons stated below, the Court **REMANDS** the decision of the Commissioner for further

consideration.

## I.     BACKGROUND

**A.     Procedural History**

On December 13, 2011, Alford protectively filed applications for DIB and SSI, alleging a

disability onset date of February 1, 2003, which was amended to December 13, 2011 at the hearing,

due to his degenerative disc disease, right hip spur, carpal tunnel syndrome, hypertension,

hypoglycemia, sleep apnea, depression, anxiety, and alcohol abuse.  His claims were initially

---

[1] In general, the legal standards applied are the same regardless of whether a claimant seeks Disability Insurance Benefits or Supplemental Security Income.  However, separate, parallel statutes and regulations exist for DIB and SSI claims.  Therefore, citations in this opinion should be considered to refer to the appropriate parallel provision as context dictates.  The same applies to citations of statutes or regulations found in quoted decisions.

denied on March 29, 2012, and again on reconsideration on July 19, 2012.  Alford requested a

hearing and on August 14, 2013, a hearing was held before Administrative Law Judge Belinda J.

Brown (the "ALJ").  Constance Brown, an impartial vocational expert testified at the hearing and

Alford was represented by counsel.  On August 27, 2013, the ALJ denied Alford's applications for

DIB and SSI.  Following this decision, Alford requested review by the Appeals Council on

September 20, 2013.  On October 28, 2014, the Appeals Council denied Alford's request for

review of the ALJ's decision, thereby making the ALJ's decision the final decision of the

Commissioner for purposes of judicial review.  On December 23, 2014, Alford filed this action for

judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).

**B.    Factual Background**

At the time of his amended alleged disability onset date, Alford was 49 years old, and he

was 50 years old at the time of the ALJ's decision.  Alford completed his high school education.

Prior to the onset of his alleged disability, he had an employment history of working as a forklift

driver and lawn service worker.

Alford began complaining of back pain, arm and hand pain, and carpal tunnel syndrome as

early as 2002.  An MRI of his back from 2002 showed degenerative disc changes for which he

received some physical therapy.  In 2002 and 2003, Alford underwent discectomy surgeries

because of his lower back pain and leg pain.  Throughout 2002, 2003, and 2004, Alford presented

to his primary care physician for periodic check-ups, follow-ups, and complaints of pain or injury.

He was prescribed various medications for pain management.

In December 2004, Alford presented to an emergency room with complaints of back pain,

which was radiating down into his legs and feet.  He reported that he had received two discectomy

surgeries in the previous years, that he was having more back pain again, and that he had to use a

walker.  An MRI revealed a herniated disc, but he was able to heel/toe walk and step on a stool without problems, demonstrating no weakness.

An MRI of Alford's lumbar spine from June 2005 and another from January 2006 revealed degenerative disc disease, herniated disc, and post-operative changes, including scarring.  They also showed that the post-operative changes were stable.  Additionally, the MRIs showed stenosis and nerve compression.

In January 2010, Alford went to his primary care physician, Joy L. Stone, M.D. ("Dr. Stone"), with complaints of right hand pain.  An x-ray revealed an old fracture in his finger and no problems with his wrist.  Dr. Stone referred Alford to an orthopedist.

Alford went to orthopedic surgeon Thomas J. Mathews, M.D. ("Dr. Mathews"), in April 2010 to follow up on his complaints.  Dr. Mathews noted mild swelling in his right hand and arthritic changes in all of his fingers but no triggering.  He retained full range of motion and intact motor and sensory function.  Alford had tenderness over his right elbow and pain with resisted wrist extension.  Dr. Mathews prescribed medication and a tennis elbow strap but did not see a need for surgical intervention at that time.

In May 2011, Alford returned to Dr. Stone with complaints of numbness and pain in his right arm and hand and pain in his right leg.  Dr. Stone recommended over-the-counter pain medication and physical therapy.

Alford met with neurologist Mark J. Janicki, M.D. ("Dr. Janicki") on May 23, 2011, for his complaints of right shoulder, elbow, and hand pain.  His examination was normal aside from a slight decrease in hand intrinsics on the right compared to the left.  Reflexes were symmetrical. There was no detection of sensory loss.  There was no actual atrophy.  It appeared that there was no tenderness in the elbows.  However, Dr. Janicki ordered an EMG test and nerve conduction

study to rule out any neuropathic processes.  The testing revealed rather significant carpal tunnel syndrome on the right.

Alford returned to Dr. Stone on October 18, 2011 with complaints of back and arm pain. On examination, she noted no problems with his movement and also noted that he rode his bicycle to her office.  She gave Alford Neurontin for his back and leg pain and explained that pains pills were not being prescribed because of the risk for addiction.  When Alford asked Dr. Stone to complete disability paperwork for him, she refused, explaining that she does not do disability paperwork, and that even if she did, she saw no evidence of disability.  She referred Alford to see Peter G. Gianaris, M.D. ("Dr. Gianaris"), a spine specialist.

Later that month, Dr. Stone ordered MRIs of Alford's thoracic and lumbar spine.  The imaging showed no significant narrowing in Alford's mid-back but mild disc dehydration and kyphosis.  The MRI of the lower back revealed disc dehydration and disc bulging.  Postoperative changes were noted.  Multilevel spondylosis and narrowing in his lower back were noted.  It also revealed moderate to severe foraminal narrowing that flattened nerve roots in his lower back.

On January 4, 2012, Alford saw spine specialist Dr. Gianaris for his complaints of lower back pain and tingling in his fingers.  When examined, Alford had no abnormalities other than tenderness in his neck and lower back and a decreased range of motion in his lower back.  He retained full range of motion in his shoulders, arms, and wrists.  There was no tenderness in his arms and legs.  Strength and tone were normal.  There were no signs of atrophy.  His gait and station were normal.  Dr. Gianaris noted routine degenerative change and postoperative change on imaging but found no nerve root impingement.  Dr. Gianaris opined that Alford did not require neurosurgical treatment.  He suggested physical therapy and a nerve root injection.

On January 23, 2012, pain management specialist David M. Ratzman, M.D. ("Dr. Ratzman"), examined Alford and noted his normal gait, motor strength, and range of motion in his joints and spine, as well as his ability to walk on his heels but an inability to walk on his toes because of an earlier ankle injury.  Alford had decreased sensation in his right foot and calf. Dr. Ratzman also conducted the Oswestry Disability Index test for Alford, and "his score was 68%, indicating a severe disability, secondary to pain."  (Filing No. 12-9 at 60.)  He noted some lateral recess and neuroforaminal narrowing, lumbar radiculitis, and degenerative disc disease. Also on January 23, 2012, Dr. Ratzman attempted a nerve root injection to treat Alford's pain, but the procedure was discontinued because Alford experienced a vagal reaction.

Dr. Ratzman successfully administered a nerve root injection on February 9, 2012.  The procedure provided nearly complete pain relief for Alford.  On February 24, 2012, Dr. Gianaris prescribed Alford a rolling walker with a seat and "released" him for work with a ten pound weight restriction.

Consultative examiner Schvon Cummings, M.D. ("Dr. Cummings"), examined Alford in March 2012 at the request of the state agency.  Alford's examination was mostly normal with the exception of slightly reduced strength in his left arm and leg, reduced grip strength in both hands with no atrophy, and difficulty dialing a telephone and opening jars/bottles.  Dr. Cummings noted that Alford's coordination was good, and he was able to write and use buttons, snaps, and zippers, but he had pain after writing for prolonged periods.  Alford also dropped coins from time to time and was unable to type.  Also in March 2012, it was noted that Alford failed a psychological examination, making him ineligible for a spinal cord stimulator.

During an office visit on April 26, 2012, Alford complained of wrist pain to Dr. Stone, but his examination was normal.  Dr. Stone counseled him to restart his pain medication. Thereafter,

on May 3, 2012, Alford met with orthopedic surgeon Scott B. Taylor, M.D. ("Dr. Taylor"), for his complaints of lower back pain.  He told Dr. Taylor that he occasionally used a walker and that his last nerve block injection was somewhat helpful.  He also acknowledged that he was ineligible for a spinal cord stimulator because of a failed psychological examination.  On examination, Alford had tenderness in his lower back and atrophy in his legs.  He also had decreased flexibility in his spine.  He had fairly good grip strength, balance, and coordination.  Dr. Taylor prescribed a TENS unit, an LS corset, compounding formula, and anti-inflammatory medication.

A June 18, 2012 MRI of Alford's neck showed mild multilevel spondylosis and mild to moderate narrowing that could be affecting the nerve root.  This MRI was taken in response to complaints of neck and arm pain.

On August 14, 2012, Alford returned to Dr. Gianaris, who felt that Alford was "checking out pretty well."  He noted Alford's equivocal Tinel's signs at both elbows, but also his excellent range of motion in his lower back, aside from some intermittent low back and right leg difficulties. Alford also noted difficulties in his arms.  Dr. Gianaris noted that Alford had normal sensation in his hand and a full range of motion in his neck.  Two days later, Alford had an office visit with Dr. Stone.  He complained of pain, tingling, and swelling in his neck, shoulders, arms, and upper back. However, his examination was normal.

On September 24, 2012, neurosurgeon Julius A. Silvidi, M.D. ("Dr. Silvidi"), examined Alford due to his complaints of neck pain and tingling, numbness, and pain in his hands.  He noted that Alford's neck MRI confirmed spondylosis and foraminal stenosis.  Dr. Silvidi noted that Alford's symptoms and examination were consistent with carpal tunnel syndrome, and if confirmed, Dr. Silvidi recommended carpal tunnel release surgery.  After confirming the carpal tunnel syndrome, Dr. Silvidi performed a carpal tunnel release surgery on Alford's right wrist on

6

November 30, 2012.  From January through March 2013, Alford had occupational therapy for his carpal tunnel syndrome.

On January 24, 2013, Alford presented to Dr. Stone with complaints of fatigue and poorly controlled right hip pain.  He described the feeling as being like "hot coals" and tenderness in his right lateral hip, which had progressively worsened over the previous few years.  He reported that the pain increased when he was on his feet for extended periods of time.  Alford explained that his fatigue was constant and moderately severe.  It was aggravated by joint pain, muscle pain, depression, and weight gain.  He explained that once he was sitting in a chair or laying on the floor it took "everything in his power" to get up.  Dr. Stone referred Alford to receive an x-ray of his hip.  X-rays were taken that same day, and they revealed a large spur at the greater trochanter on the right.  The hip joint space was normal, and there were no fractures.

Because of this right hip spur, Alford was referred to an orthopedist. He met with the orthopedist on February 21, 2013, and he reported to the orthopedist that he did not have back pain or any pain radiating down into his leg.  Upon physical examination, Alford was exquisitely tender over the greater trochanter on the right but not on the left.  The orthopedist noted the mild bony spur on the x-ray and diagnosed Alford with trochanteric bursitis.  During this appointment, Alford received a hip injection, which was tolerated well.

A February 5, 2013 MRI of Alford's lumbar spine showed multiple degenerative disc disease with severe bilateral narrowing, spinal canal stenosis, and foraminal stenosis.

In May 2013, Alford presented to the emergency room after hitting his hand on a ladder. His hand was x-rayed, and it was discovered that he fractured his third finger on the right hand. Around this time, he also complained to Dr. Stone of pain in both thumbs with popping and

clicking, but Dr. Stone found only mild swelling and tenderness in his thumbs and noted that his fracture was stable.

On July 31, 2013, Dr. Taylor completed a Lumbar Spine Residual Functional Capacity Questionnaire for Alford. He noted that he had seen Alford multiple times since February 2012 and that Alford's clinical findings included a positive straight leg raising test, an abnormal gait, reflex changes, tenderness, spasm, weakness, weight change, impaired sleep, and stiff legs and back. Dr. Taylor opined that Alford's symptoms were severe enough to frequently interfere with the attention and concentration needed to perform simple work tasks and that he could walk one and a half city blocks without rest or severe pain. He opined that Alford could sit or stand for five to ten minutes at one time and for less than two hours total in an eight-hour workday. Dr. Taylor further opined that Alford needed to walk around for three to five minutes every ten to fifteen minutes and that he needed unscheduled breaks every fifteen minutes in an eight-hour workday, lasting about ten minutes each. He opined that Alford needed to use a cane or other assistive device when engaging in occasional standing or walking and that he could rarely and occasionally lift and carry less than ten pounds. Alford could never crouch/squat or climb stairs, could rarely climb ladders, and could occasionally twist and stoop. Dr. Taylor opined that Alford had significant limitations in doing repetitive reaching, handling, or fingering, but he then stated that Alford could use his hands to grasp, twist, and turn objects, use his fingers for fine manipulations, and use his arms for reaching, including overhead, one hundred percent of an eight-hour workday. Dr. Taylor stated that Alford's impairments were likely to produce good and bad days and that on average he was likely to be absent from work as a result of his impairments or treatment more than four days per month.

Alford met with pain management specialist Raymond S. Nanko, M.D. ("Dr. Nanko"), on August 5, 2013, for his complaints of leg and back pain. He also was evaluated for a second opinion to receive a spinal cord stimulator. Dr. Nanko noted his limp and restricted gait and motion, as well as his reduced range of motion in his lower spine and diminished sensation to light touch. Dr. Nanko also noted Alford had no strength deficits and had a normal straight leg raising test in both legs. Dr. Nanko found that Alford was a good candidate for a spinal cord stimulator.

Alford was examined and cross-examined during the disability hearing before the ALJ on August 14, 2013. He explained that in 2012 he worked as a dishwasher at restaurants. He also testified that he had his own lawn mowing business. He had a contract with the City of New Castle through 2008, mowing six city parks, doing all the mowing himself. Under his contract with the city, Alford earned more than $50,000.00 per year. His contract with the city ended at the end of 2008 when the city terminated its contracts with private contractors and used jail inmates to provide lawn services. After his city contract ended, Alford continued his mowing business by mowing residences. He was able to mow a couple of lawns per day, earning about $200.00 every two weeks. He testified that he was no longer able to work due to pain in his lower back and legs, particularly when walking on uneven surfaces. When asked about his mowing business, Alford testified that he used his own mower, walked it from place to place, and had to sit and rest about every ten to fifteen minutes.

Alford also testified that he went to church about a block away from his house. He could do his own grocery shopping, but he used a walker when going to the store, and he could not buy large quantities because he could not carry them. He testified that he could walk about one and one-half blocks and lift about ten pounds. Alford explained that he received surgery on his fingers and for his carpal tunnel syndrome, and he did not usually use prescription pain medication and

that over-the-counter medication was not very effective.  He would experience pain relief for about

a month after his injections, and his TENS unit worked pretty well to control his pain.

## II.   DISABILITY AND STANDARD OF REVIEW

Under the Act, a claimant may be entitled to DIB or SSI only after he establishes that he is

disabled.  Disability is defined as the "inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months."  42 U.S.C. § 423(d)(1)(A).  In order to be found disabled, a claimant must

demonstrate that his physical or mental limitations prevent him from doing not only his previous

work but any other kind of gainful employment which exists in the national economy, considering

his age, education, and work experience.  42 U.S.C. § 423(d)(2)(A).

The Commissioner employs a five-step sequential analysis to determine whether a claimant

is disabled.  At step one, if the claimant is engaged in substantial gainful activity, he is not disabled

despite his medical condition and other factors.  20 C.F.R. § 416.920(a)(4)(i).  At step two, if the

claimant does not have a "severe" impairment that meets the durational requirement, he is not

disabled.  20 C.F.R. § 416.920(a)(4)(ii).  A severe impairment is one that "significantly limits [a

claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  At

step three, the Commissioner determines whether the claimant's impairment or combination of

impairments meets or medically equals any impairment that appears in the Listing of Impairments,

20 C.F.R. Part 404, Subpart P, Appendix 1, and whether the impairment meets the twelve month

duration requirement; if so, the claimant is deemed disabled.  20 C.F.R. § 416.920(a)(4)(iii).

If the claimant's impairments do not meet or medically equal one of the impairments on

the Listing of Impairments, then his residual functional capacity will be assessed and used for the

fourth and fifth steps. Residual functional capacity ("RFC") is the "maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(1); SSR 96-8p). At step four, if the claimant is able to perform his past relevant work, he is not disabled. 20 C.F.R. § 416.920(a)(4)(iv). At the fifth and final step, it must be determined whether the claimant can perform any other work in the relevant economy, given his RFC and considering his age, education, and past work experience. 20 C.F.R. § 404.1520(a)(4)(v). The claimant is not disabled if he can perform any other work in the relevant economy.

The combined effect of all the impairments of the claimant shall be considered throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B). The burden of proof is on the claimant for the first four steps; it then shifts to the Commissioner for the fifth step. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

Section 405(g) of the Act gives the court "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). In reviewing the ALJ's decision, this Court must uphold the ALJ's findings of fact if the findings are supported by substantial evidence and no error of law occurred. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* Further, this Court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). While the Court reviews the ALJ's decision deferentially, the Court cannot uphold an ALJ's decision if the decision "fails to mention highly pertinent evidence, . . . or that because

of contradictions or missing premises fails to build a logical bridge between the facts of the case and the outcome." *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010) (citations omitted).

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ is required to articulate only a minimal, but legitimate, justification for her acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004).

## III.   THE ALJ'S DECISION

The ALJ first determined that Alford met the insured status requirement of the Act for DIB through December 31, 2008. The ALJ then began the five-step analysis. At step one, the ALJ found that Alford had not engaged in substantial gainful activity since February 1, 2003, the alleged disability onset date. At step two, the ALJ found that Alford had the following severe impairments: degenerative disc disease and right hip spur. At step three, the ALJ concluded that Alford does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ then determined that Alford has an RFC to perform light work, but "he must be allowed to alternate from sitting to standing for fifteen minutes out of every hour. He can never climb ladders or scaffolds. He can occasionally climb ramps and stairs with use of a handrail. He can occasionally balance, stoop, crouch, kneel, and crawl. He must avoid unprotected heights." (Filing No. 12-2 at 23.)

At step four, the ALJ determined that Alford was unable to perform his past work as a forklift driver and lawn service worker because the demands of his past relevant work exceeded

12

his RFC.  At step five, the ALJ determined that Alford is not disabled because there are jobs that exist in significant numbers in the national economy that Alford could perform, considering his age, education, past work experience, and RFC.  Therefore, the ALJ denied Alford's applications for DIB and SSI because he is not disabled.

## IV.   DISCUSSION

In his request for judicial review, Alford offers three reasons why the ALJ's decision is erroneous. First, he asserts that the ALJ failed to acknowledge and consider certain evidence that supported a finding that his back impairment met or medically equaled Listing 1.04 for disorders of the spine.  Second, he argues that the ALJ failed to address why his carpal tunnel syndrome was not a severe impairment at Step 2.  Third, he argues that the ALJ failed to consider his carpal tunnel syndrome and use of a walker when determining his RFC and any available jobs in the economy.

## A.   The ALJ's Medical Equivalence Determination for Listing 1.04

Alford first asserts that the ALJ's decision should be reversed because the ALJ failed at Step 3 to acknowledge and consider certain evidence that supported a finding that his back impairment met or medically equaled Listing 1.04 for disorders of the spine.  He alleges that the ALJ did not evaluate the evidence that was favorable to his back impairment, which would meet the criteria for Listing 1.04.  He explains, "[i]t is troubling that the ALJ did not evaluate any of the evidence on its required criteria that is favorable to Alford as there are in fact objective test results showing nerve root compression and spinal stenosis in the record." (Filing No. 14 at 22.)  Alford then points to the findings from his various MRIs and asserts that clearly there was evidence of nerve root compression and spinal stenosis.  Indeed, the MRI findings indicated spinal canal stenosis and nerve root impingement, and he was diagnosed multiple times with degenerative disc disease.

13

"Although an ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009). Similarly, "[a]lthough the ALJ need not discuss every piece of evidence in the record, he must confront the evidence that does not support his conclusion and explain why it was rejected." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004).

Responding to Alford's argument, the Commissioner asserts that in order to meet a listed impairment, a claimant must provide medical evidence that establishes all of the criteria specified in the listed section. The Commissioner then focuses her argument on an inability to ambulate effectively and spinal stenosis. The Commissioner notes that the ALJ found that there was no evidence that Alford had an inability to ambulate effectively, and thus, he could not establish medical equivalence under Listing 1.04. However, this finding was in the context of the short, conclusory finding that Alford's right hip spur did not meet Listing 1.02A for major dysfunction of a joint due to any cause. Additionally, an inability to ambulate effectively is considered only under Listing 1.04(C) and is not necessary to meet Listings 1.04(A) or 1.04(B). There was no consideration of the elements to meet Listings 1.04(A) and 1.04(B).

The criteria for Listing 1.04 are found at 20 C.F.R. Part 404, Subpart P, Appendix 1. In order for a back impairment to meet or medically equal Listing 1.04, a claimant must show:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
> or

14

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

If the criteria of the introductory paragraph are met—a disorder of the spine resulting in compromise of a nerve root or the spinal cord—as well as all the criteria in subparagraphs A, B, or C, then a back impairment meets or medically equals Listing 1.04.

The entirety of the ALJ's discussion of the Listing 1.04 determination at Step 3 is quoted here: "The claimant's degenerative disc disease has been considered under Listing 1.04 (*Disorders of the spine*). Listing 1.04 is not met because nowhere in any record submitted by the claimant is there evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis." (Filing No. 12-2 at 23.) There was medical evidence in the record of degenerative disc disease, nerve root compression, and spinal stenosis, but the ALJ did not consider or discuss the criteria of Listings 1.04(A) or 1.04(B).

"Although the ALJ is not required to mention every piece of evidence in the record, [her] failure here to evaluate any of the evidence that potentially supported [Alford's] claim does not provide much assurance that [she] adequately considered [Alford's] case." *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006) (citations omitted). Because of the hastiness of the ALJ's Step 3 discussion, the Court is left to guess at what the ALJ considered at Step 3 of the disability determination. Accordingly, the Court remands the case to the Social Security Administration so that the Agency can conduct a more thorough analysis of the evidence at Step 3.

**B.     The ALJ's Step 2 Consideration of Carpal Tunnel Syndrome**

Next, Alford argues that the ALJ failed to address why his carpal tunnel syndrome was not a severe impairment at Step 2.  He asserts that an ALJ must sufficiently articulate his assessment of evidence to assure that the important evidence was considered.  Otherwise, the minimum level of articulation is not satisfied.  *Carlson v. Shalala*, 999 F.2d 181 (7th Cir. 1993). "One inference from a silent opinion is that the ALJ did not reject the evidence but simply forgot it or thought it irrelevant."  *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985).  This is the reason the ALJ must mention and discuss evidence that supports the claim for benefits.  *Id.*  Alford then points to the evidence of his subjective complaints and symptoms of carpal tunnel syndrome, the EMG study, medications that were prescribed, and his carpal tunnel release surgery. He points to the evidence of his physical examinations that supported a diagnosis of carpal tunnel syndrome. Alford concludes that, while the ALJ briefly summarized his carpal tunnel syndrome in the decision, she failed to address why the condition did not meet the standards for being considered "severe."

In response to Alford's argument, the Commissioner explains that an impairment is "severe" if it significantly limits the claimant's ability to do basic work activities without considering the claimant's age, education, or work experience, citing 20 C.F.R. § 404.1521(a) and *Bowen v. Yuckert*, 482 U.S. 137, 140–41 (1987).  Further, an impairment or combination of impairments is not severe when the medical evidence establishes only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on a claimant's physical or mental ability to perform basic work activities, citing 20 C.F.R. § 404.1521 and *Castile v. Astrue*, 617 F.3d 923, 927 (7th Cir. 2010).  The Commissioner then argues that the ALJ's discussion of the evidence was sufficient to allow the Court to follow her reasoning and that if an ALJ determines that a claimant has at least one severe impairment and considers non-severe

16

impairments in combination with the severe impairments in the remaining steps of the disability evaluation, the particular determination of which impairments are severe "is of no consequence with respect to the outcome of the case," quoting *Castile*, 617 F.3d at 927.  The Commissioner then asserts that the ALJ considered Alford's carpal tunnel syndrome before Step 4 of the disability evaluation when determining his RFC, and thus her severity determination at Step 2 was of no consequence.  However, as will be explained below, the ALJ did not discuss Alford's carpal tunnel syndrome when determining his RFC.  The RFC analysis and discussion was devoted to Alford's degenerative disc disease and right hip spur.

When discussing her Step 2 analysis, the ALJ briefly noted Alford's history of carpal tunnel syndrome.  She noted that he saw Dr. Janicki, had an EMG that revealed rather significant right carpal tunnel syndrome, and underwent a carpal tunnel release surgery.  However, the ALJ says nothing about the severity of the impairment.  The ALJ does not explain that the impairment is a "medically determinable impairment," "non-severe," or "severe."  The ALJ's decision says nothing about whether the impairment causes no more than minimal limitation in Alford's ability to perform basic work activities.  As Alford explained, while the ALJ briefly summarized his carpal tunnel syndrome in the decision, she failed to address why the impairment did not meet the standards for being considered severe, and she did not discuss any further considerations of the impairment and its impact on the disability determination.  The Court can only assume what the ALJ thought about the impairment of carpal tunnel syndrome, but an adequate, sustainable decision from an ALJ does not leave the Court assuming.  The Court determines that remand is appropriate on this additional basis.

C.     **The ALJ's RFC Determination**

17

Lastly, Alford argues that the ALJ failed to consider his carpal tunnel syndrome and use of a walker when determining his RFC and any available jobs in the economy.  He explains that he was prescribed a rolling walker with a seat and given a ten pound weight restriction by a treating physician.  Alford reported using a walker and his neighbor reported seeing him use a walker.  Further, Dr. Taylor also noted that he must use a cane or other assistive device for standing and walking.  Alford argues that his use of a walker was not incorporated into the RFC even though the ALJ was aware of the prescription and at least occasional use of the walker. Alford argues there was no discussion of the ALJ's consideration of this evidence nor the weight placed on it. The ALJ merely acknowledged that a walker was used but not whether it was necessary and not the impact it would have on the availability of work.  It was not adopted in the RFC or presented to the vocational expert to inquire about the implications of a walker in the work environment.

Regarding his carpal tunnel syndrome, Alford similarly argues that the ALJ's RFC determination failed to discuss the impact his carpal tunnel syndrome would have on his ability to maintain employment.  He asserts that this is important because, even when reduced to just occasional hand use, there would be no jobs available that he could perform.  He explains that his carpal tunnel syndrome was not considered or adopted in the RFC and was not presented to the vocational expert to inquire about its implications on his work prospects.  Alford acknowledges that an ALJ is not required to address every piece of testimony and evidence, but he asserts that it is impermissible for an ALJ to ignore an entire line of evidence or select and discuss only that evidence which favors her ultimate conclusion, citing *Carroll v. Barnhart*, 291 F. Supp. 2d 783, 798 (N.D. Ill. 2003).

The Commissioner responds that the ALJ's RFC determination was supported by substantial evidence and that she built a logical bridge between the evidence and her conclusions.

The Commissioner explains that the ALJ considered the evidence of Alford's use of a walker and gave little weight to that evidence when weighing it against the record as a whole.   The Commissioner similarly argues that the ALJ considered the evidence of Alford's carpal tunnel syndrome when determining his RFC.   While the ALJ very briefly recounted the history of Alford's use of a walker in the RFC section, she did not discuss Alford's carpal tunnel syndrome as the Commissioner asserts.

When explaining the rationale and analysis for her RFC determination, the ALJ began by asserting that Alford alleges disability based on degenerative disc disease and a right hip spur. From there, the entire premise of the RFC determination was those two impairments alone.  She did not explicitly include carpal tunnel syndrome, or any other impairments, in this analysis.  The ALJ went on to explain the medical evidence in the record, describing Alford's symptoms and some of his treatments.   However, this discussion of the medical evidence was in relation to Alford's impairments of degenerative disc disease and a right hip spur, not carpal tunnel syndrome. While her discussion of some of the medical records included the symptoms of carpal tunnel syndrome, the ALJ never actually analyzed or discussed the impairment when making her RFC determination.  Again, the Court is left to guess whether the ALJ considered any impairments, both severe and non-severe, other than Alford's degenerative disc disease and right hip spur when determining the RFC and then presenting hypothetical questions to the vocational expert. This provides an additional basis for the Court to remand the case for further proceedings.

## V.   CONCLUSION

For the reasons set forth above, the final decision of the Commissioner is **REMANDED** for further proceedings as authorized by Sentence Four of 42 U.S.C. § 405(g).

**SO ORDERED.**

19

Date: 3/22/2016

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Charles D. Hankey
charleshankey@hankeylawoffice.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov